**Gabriel SZEKELY, M.D.,**
**Plaintiff-Appellee,**

v.

**FLORIDA MEDICAL ASSOCIATION**
**et al., Defendants,**

**Caspar W. Weinberger, Secretary of**
**Health, Education and Welfare,**
**Defendant-Appellant.**

**No. 74–3398.**

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1975.

---

Robert W. Rust, U. S. Atty., Miami, Fla., Robert E. Kopp, David M. Cohen, Attys., Dept. of Justice, Civ. Div., App. Section, Washington, D. C., for defendant-appellant.

Michael A. Lipsky, Miami, Fla., for plaintiff-appellee.

Milton R. Adkins, Miami, Fla., for Blue Shield of Fla., Inc.

Before BROWN, Chief Judge, and GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This is a companion case to *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329 (CA5, 1975), decided this date. Proceeding as in that case on the theory of a common law right to recoup, the Department of Health, Education and Welfare [HEW] attempted to recoup from Dr. Gabriel Szekely approximately $14,000 allegedly paid to him for medically unnecessary services provided to beneficiaries under the Medicare supplementary medical insurance system in 1970. Before HEW could put into effect a freeze on future payments to him to offset the amount claimed, Dr. Szekely, just as the hospital did in *Mount Sinai,* sued for temporary and permanent injunctive relief against the freeze. The District Court, on cross motions for summary judgment and relying on the recent decision in *Mount Sinai,* 376 F.Supp. 1099 (S.D.Fla., 1974), granted injunctive relief. We reverse for reasons substantially similar to those that we have given in *Mount Sinai.*

The Medicare system is described in our *Mount Sinai* opinion. This case concerns Part B of the Act, providing insurance for supplementary medical services primarily physicians' services, 42 U.S.C. §§ 1395j–1395w (Supp. II).[1]

Under Part B, persons aged 65 and older, § 1395o[2] are eligible to enroll to obtain benefits, § 1395p, in return for payment of monthly premiums the amounts of which are established by the Secretary of HEW, §§ 1395r(b) and (c). These premiums and contributions from the federal government go into the Federal Supplementary Medical Insurance Trust Fund, § 1395t, to pay for the benefits provided by Part B, §§ 1395l(a) and 1395t(g). These include "medical and other health services," including *e. g.,* physicians', diagnostic, outpatient physical therapy, ambulance, and home health services, §§ 1395k and 1395x(s).

An enrolled individual who obtains a covered service can either pay for the service and request reimbursement, § 1395u(b)(3)(B)(i), of 80 percent of the reasonable charge, § 1395l(a), or assign the right to reimbursement to the person providing the service, who can collect as an assignee of the beneficiary, § 1395u(b)(3)(B)(ii). All payments are subject to a deductible, § 1395l(b). No payment may be made for services that are not medically necessary, § 1395y(a)(1).

HEW is authorized to act through intermediaries called "carriers" for administration of Part B, § 1395u. These are private entities, like defendant Blue Shield of Florida, Inc., which perform a variety of functions as agents of HEW, such as determining the rates and amounts of payments and making the actual payments. Although payment for most services is limited to the "reasonable charges" for the services provided, §§ 1395l(a)(1) and (2)(A), this does not entail the kind of provisional payment and auditing procedures utilitized to determine "reasonable cost" under §§ 1395f(b), 1395g and 1395x(v) for purposes of Part A. Beneficiaries are reimbursed, or doctors holding assignments are paid, on the basis of the amounts

---

1. Part A is the subject of *Mount Sinai.* Part C, containing general provisions applicable to both Parts A and B, is at issue in both cases.

2. Hereinafter, all references to sections mean sections of Title 42 of the U.S.Code, 1970 edition, or a supplement thereto, unless indicated otherwise.

charged, subject to the carriers' responsibility to establish appropriate reasonable amounts pursuant to 20 C.F.R. § 405.501 *et seq.*

When payment on a claim is denied, the patient has a right to an "informal review determination" conducted by the carrier, § 1395u(b)(3)(C) and 20 C.F.R. §§ 405.801(a) and 405.807–405.812, and to a review of that decision in a hearing also conducted by the carrier, 20 C.F.R. §§ 405.820–405.835. A physician who has accepted an assignment from a patient has the same right to review as the patient, 20 C.F.R. § 405.801(a). Judicial review is not explicitly provided for determinations of benefits under Part B, although it is provided for determinations of amount of benefits under Part A and for determinations of eligibility or enrollment under Part B, §§ 1395ff(b)(1)(B) and (C) and (2). It is fairly clear from the words of the statute and regulations, § 1395u(b)(3)(C) and 20 C.F.R. § 405.801 *et seq.* that the hearing and review there provided to determine if payment is proper, are to be utilized prior to payment and not subsequently.

Dr. Szekely practices medicine in Dade County, Florida, and the larger part of his practice involves elderly persons who are usually Medicare beneficiaries. In 1970 he received approximately $70,000 in payments under Part B, paid pursuant to assignments given to him by his patients and submitted to the carrier.

In early 1972 the carrier ascertained that Dr. Szekely appeared to bill Medicare for an excessive number of office visits per patient and for excessive ancillary services provided in his office. It tentatively determined that 25 percent of all Medicare payments made to Dr. Szekely in 1970 would have to be returned. Peer review committee procedures affirmed the carrier's action. Dr. Szekely then brought this suit.

This case is, if anything, a stronger case for recoupment than *Mount Sinai,* and we accordingly hold that the government's common law right to recoup is available. The gist of the argument against recoupment is that prior cases have subjected to recoupment only gratuitous beneficiaries of government grants and recipients of excessive contract payments. Dr. Szekely argues that he is neither but rather a third-party provider of services who has given value in the form of medical services for all government funds received, and so should not be subjected to recoupment. But the Medicare Act specifically recognizes recoupment of overpayments from providers, § 1395gg(b)(1)(A). This recoupment is directed at overpayments for which beneficiaries might also be held liable, § 1395gg(b), thus excluding payments in excess of the reasonable charge, for which beneficiaries could never be at fault, § 1395gg(c). This leaves only coverage overpayments, *Cf., Mount Sinai, supra.*

Moreover, the physician-provider is in a unique position. His claim is that of an assignee of the beneficiary, which, in the absence of fraud, can be no greater than that of the beneficiary. *McKnight v. United States,* 98 U.S. 179, 25 L.Ed. 115 (1879). More important, the doctor is not a stranger to Medicare. On the contrary he is the crucial actor in the three-way relationship between beneficiary, provider and HEW. It is obvious that the patient must rely on the doctor's judgment. The statute requires the Social Security Administration, in administering the Medicare Act, to rely on the doctor's judgment in the first instance by requiring his certification of medical necessity, § 1395n(a)(2)(B).[3] This certification requirement puts the doctor on notice that the assignment he takes from the patient is valid only where the services provided are medically necessary.

---

**3.** *And see, e. g.,* S.Rept. No. 404, 89th Cong., 1st Sess., p. 46 (1965) U.S.Code Cong. & Admin.News 1965, p. 1986: "The physician is to be the key figure in determining utilization of health services . . . "

In *Mount Sinai* we hold that the Act not only does not abrogate the common law recoupment right with regard to coverage overpayments but that it specifically recognizes such recoupment in § 1395gg. The argument rejected in *Mount Sinai*—that the dichotomy in Part A between procedures relating to cost and those relating to coverage precludes common law recoupment of coverage overpayments—cannot be put forward logically with regard to Part B where the cost and coverage procedures are the same.[4] Section 1395gg, which recognizes common law recoupment, is in Part C, the general provisions applicable to both Part A and Part B. All that is said in *Mount Sinai* about § 1395gg is equally applicable here.

The 1972 amendments to § 1395gg and related sections confirm our view. As noted in *Mount Sinai,* the legislative history strongly suggests that recoupment against providers was considered the remedy of first resort. S.Rept. 92–1230, 92d Cong., 1st Sess., pp. 313–314 (1971). In addition to the two changes in § 1395gg, Congress in the same amending section added § 1395cc(a)(1)(B), which explicitly prohibited providers from taking an action over against beneficiaries where a service they performed was held unnecessary more than three years after notice of payment was sent. Social Security Amendments of 1972, Act of Oct. 30, 1972, P.L. 92–603, § 281(c), 86 Stat. 1455. This change is meaningless unless HEW has the right to recoup from providers payments made for unnecessary services more than three years after payment. Congress, again in the same amending section, added a fourth change which prohibits doctors from doing exactly what providers were prohibited from doing: attempting to collect from their patients charges for non-covered services where the determination of non-coverage is made more than three years after payment. P.L. 92–603, § 281(d), 86 Stat. 1455, codified as § 1395u(b)(3)(B)(ii). Similarly, this prohibition is meaningless unless HEW has the right to recoup payments from doctors for unnecessary medical services, and unless HEW may recoup more than three years after payment.

Although subsequent statements by Congress are not controlling, Congress' actions in this case carry unusually great weight. See the discussion in *Mount Sinai, supra.*

Appellees seem to suggest that the addition of the professional standards review organizations (PSRO) system in 1972 was an attempt to provide a remedy where Congress thought none had previously existed, and that this new remedy is a type of statutory recoupment. The target of the PSRO system, however, is not the same as that of recoupment. The latter concerns any kind of overpayment. The PSRO system was designed to deal with hospitals and physicians who abuse the program or who provide not only unnecessary but positively harmful services. Even if Dr. Szekely falls within the ambit of those amendments, that fact does not preclude the common law recoupment recognized elsewhere in the Act.

We have already noted that the difference in cost and coverage procedures in Part A, which was a mainstay of the trial court's opinion in *Mount Sinai,* are not present in Part B. There are other administrative distinctions between Parts A and B which make a holding of statutory abrogation of recoupment even less appropriate for Part B than it would be for Part A. For example, Part A contains a preliminary payment and post-audit adjustment system for reasonable cost determinations, § 1395g. This system suggests that Congress considered recoupment against providers and decided to limit it to recovering reasonable cost overpayments. For the reasons given in *Mount Sinai,* we do not find that argument persuasive with regard to Part A. With regard to Part B there is no argument to be made along this line at all. Part B, does not have any provisional payment or annual audit or adjustment system, so there can be no

---

4. Doctors holding assignments have an identical right to a hearing and review of denial of claims prior to payment, § 1395u(b)(3)(C) and 20 C.F.R. § 405.801(a).

implication that Congress meant to enact a limited form of recoupment from providers.

Similarly, other Part A provisions relied on by the trial court in *Mount Sinai,* §§ 1395f(e) and 1395cc(d), have no analogues in Part B. Thus a finding of abrogation is even less appropriate for Part B than it would be for Part A.

■ Permitting HEW to recoup funds paid out for medically unnecessary services does not constitute impermissible supervision of the practice of medicine, prohibited by § 1395. The only issue posed by recoupment—and it is the same issue posed in the denial of any claim, whether pursuant to explicit statutory pre-payment procedures or implicit common law post-payment recoupment—is whether the government should pay for the services provided. This does not constitute prohibited federal supervision of the practice of medicine.

Dr. Szekely's second amended complaint, upon which the trial court granted summary judgment, alludes to Fifth Amendment due process rights. Since that issue has not been decided, we remand the case for further proceedings not inconsistent with this opinion.

Reversed and remanded.